IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

STEPHEN P. KUEHL, individually and on behalf of the Estates of CHARIS A. KUEHL (deceased), and S.K. (deceased), and on behalf of N.K. and V.K., minors, and MARY L. WITTE, individually and on behalf of the Estates of STEVEN L. WITTE (deceased), and LYDIA M. WITTE (deceased),

Plaintiffs,

v.

AIRBNB, INC., GENERALI U.S. BRANCH, ABC INSURANCE CO., YEVHEN HURTOVYI, IULIIA LYTVYNEKO; and TRAVELERS PERSONAL INSURANCE COMPANY,

Defendants.

OPINION AND ORDER

25-cv-846-wmc

---

This dispute arises in the aftermath of a tragic fire at a large cabin rented through Airbnb that took the lives of six family members staying there. Plaintiffs Stephen Kuehl and Mary Witte, representing themselves and the estates of their deceased family members, assert Wisconsin negligence claims and statutory violations against defendants Airbnb, homeowners Yevhen Hurtovyi and Iuliia Lytvyneko, and their insurers, Generali U.S. Branch and Travelers Personal Insurance Company. After defendants removed the case to federal court based on diversity jurisdiction, defendant Airbnb moved to compel all plaintiffs to arbitrate their claims under its Terms of Service. (Dkt. #8.) Because Charis Kuehl bound herself, her children, and her husband to the Airbnb's Terms of Service Agreement under California law, wittingly or not, the court grants defendant Airbnb's motion to compel arbitration as to those plaintiffs. The court denies Airbnb's motion to compel as to the Witte plaintiffs.

## UNDISPUTED FACTS[1]

Plaintiffs comprise three generations of the Witte family. (Kuehl Decl. (dkt. #23) ¶ 4.) Plaintiff Mary Witte represents herself, the estate of her husband, Steven Witte, and the estate of their adult daughter, Lydia Witte. (Witte Decl. (dkt. #24) ¶ 3.) Plaintiff Stephen Kuehl represents himself, the estate of his wife Charis Kuehl (who is the daughter of Mary and Steven Witte, and sister of Lydia Witte), their two minor children V.K. and N.K., and the estate of their third minor child, S.K. (Kuehl Decl. (dkt. #23) ¶¶ 3-5.)

The extended Witte family planned a week-long, family trip to a large cabin available for rent through Airbnb in Germantown, Juneau County, Wisconsin, over the week of July 4th, 2024. (Compl. (dkt. #2-1) ¶ 1.) Plaintiffs sought a large Airbnb rental property because "the Witte family [made] a concerted effort to get together … for the purpose of connection and communion" in a setting that "offered the comforts and safety of home, community, and togetherness." (Compl. (dkt. #2-1) ¶¶ 49, 51.) Some six months before the trip, on December 28, 2023, Charis Kuehl booked this cabin, paying $10,654.89 to Airbnb upfront. (Pfeiffer Decl. (dkt. #9) ¶ 7; Compl. (dkt. #2-1) ¶ 48.) Twenty members of the extended Witte family stayed at the unit during the rental period, though the record neither reflects how expenses were allocated between each discrete family unit, nor whether the family agreed upon Charis renting the cabin on their behalf, apart from Charis "consulting with her family over the holidays." (Compl. (dkt. #2-1) ¶¶ 45, 47.)

Before Charis rented the cabin using Airbnb, however, she was required to open an

[1] Unless indicated otherwise, the facts in this section are undisputed and drawn from plaintiffs' complaint (dkt. #2), defendant Airbnb's submissions in support of its motion to compel arbitration (dkt. #9), and plaintiffs' submissions in response to that motion (dkt. #23 and dkt. #24).

Airbnb account and agree to Airbnb's Terms of Service Agreement. (Pfeiffer Decl. (dkt. #9) ¶ 3.) In Charis's case, she opened her account on August 28, 2023, and indicated her agreement to "version 13" of the Terms of Service Agreement on that day. *Id.* ¶ 13. To begin, when Charis created her account that day, a reference to "Terms of Service" appeared on her screen as shown here. (Dkt. #9-4.) In particular, the sign-up screen required that Charis enter her name, date of birth, and email, then click a larger, pink "Agree and Continue" button at the bottom of the page. (*Id.*) Just above the "Agree and Continue" button, the screen states in slightly smaller typeface: "By selecting **Agree and Continue**, I agree to Airbnb's Terms of Service, Payment Terms of Service, and Nondiscrimination Policy," as well as "acknowledged the Privacy Policy." *Id.* (bold and underlining in original). In particular, the first blue underlined phrase "Terms of Service" was a hyperlink to Airbnb's "Terms of Service Agreement," although Charis would have needed to click on that hyperlink if she wanted to review the Terms before creating her account, just as she would have to review each of the other underlined, hyperlinked terms and policies. (Pfeiffer Decl. (dkt. #9) ¶ 12.)



Further, Charis was required to affirm her agreement to version 13 of the Terms on the day she actually booked the rental cabin, December 28, 2023. *Id.* ¶ 14. The record does not indicate what screen she was shown to "agree" to the Terms of Service Agreement at that time, nor what users generally saw onscreen or were required to access before binding themselves to the Service Agreement when actually booking an Airbnb rental.

Regardless of whether accessed or not, the Terms of Service Agreement is disclosed via hyperlink as "a binding legal agreement between you and Airbnb that govern your right to use the websites, applications, and other offerings from Airbnb."[2] (Dkt. #9-5, at 2.) The first line of the Terms also alerts the user in bold lettering as follows: "**Section 23 of these Terms contains an arbitration agreement and class action waiver that apply to all claims brought against Airbnb in the United States. Please read them carefully.**" *Id.* (bold in original).[3] Later in the Terms, a subsection labelled "Arbitration Agreement" further states:

> Agreement to Arbitrate. You and Airbnb mutually agree that any dispute, claim or controversy arising out of or relating to these Terms or the applicability, breach, termination, validity, enforcement or interpretation thereof, or any use of the Airbnb Platform, Host Services, or any Content (collectively, "Disputes") will be settled by binding individual arbitration (the "Arbitration Agreement"). If there is dispute about whether this Arbitration Agreement can be enforced or applies to our Dispute, you and Airbnb agree that the arbitrator will decide that issue.

[2] Versions 11, 13, and 14 of the Terms contain materially similar descriptions. (Dkt. #9-10, at 2; dkt. #9-5, at 2; dkt. #9-11, at 2.)

[3] Versions 11, 13, and 14 of the Terms also contain materially similar opening provisions. (Dkt. #9-10, at 2; dkt. #9-5, at 2; dkt. #9-11, at 2.)

*Id.* § 23.4.[4]

Although defining "we," "us," "Hosts," and "Guests," the Terms do *not* define "you" in this arbitration provision or anywhere else in the Service Agreement. (*Id.*, at 2.)[5] The arbitration subsection also describes the rules that will apply:

> Arbitration Rules and Governing Law. This Arbitration Agreement evidences a transaction in interstate commerce and the Federal Arbitration Act governs all substantive and procedural interpretation and enforcement of this provision. The arbitration will be administered by the arbitrator in accordance with the Consumer Arbitration Rules and/or other AAA arbitration rules determined to be applicable by the AAA (the "AAA Rules") then in effect, except as modified here.

*Id.* § 23.6.[6] The Terms as a whole also contain a separate choice of law provision that states: "These Terms will be interpreted in accordance with the laws of the State of California and the United States of America, without regard to conflict-of-law provisions." *Id.* § 22.[7]

---

[4] Versions 11, 13, and 14 of the Terms further contain materially similar "Agreement to Arbitrate" provisions. (Dkt. #9-10 § 23.4; dkt. #9-5 § 23.4; dkt. #9-11 § 22.4.)

[5] No version of the Terms includes such a definition. *See* (dkt. #9-10, at 2; dkt. #9-5, at 2; dkt. #9-11, at 2.)

[6] Versions 11 and 13 contain materially similar "Arbitration Rules and Governing Law" provisions. (Dkt. #9-10 § 23.6; dkt. #9-10 § 23.6). Version 14 modifies the provision as follows:

> Arbitration Forum Rules and Governing Law. This Arbitration Agreement evidences a transaction in interstate commerce and the Federal Arbitration Act governs all substantive and procedural interpretation and enforcement of this Arbitration Agreement, and not state law. The arbitration will be administered by ADR Services, Inc. ("ADR") … in accordance with … the Federal Rules of Civil Procedure … and ADR's Arbitration Rules then in effect….

(Dkt. #9-11 § 22.6.)

[7] Versions 11, 13, and 14 of the Terms contain identical "United States Governing Law and Venue" provisions. (Dkt. #9-10 § 22; dkt. #9-5 § 22; dkt. #9-11 § 21.)

Additionally, plaintiffs Stephen Kuehl and Mary Witte had their own Airbnb accounts, which were opened on July 7, 2021, and May 23, 2024, respectively. (Pfeiffer Decl. (dkt. #9) ¶¶ 16, 23.) Similarly, each were confronted with the same, basic sign-up screen essentially requiring agreement to the versions of Airbnb's Terms of Service in effect on those dates.[8] (Pfeiffer Decl. (dkt. #9) ¶¶ 16, 23.) In April 2024, Stephen Kuehl further agreed to version 14 of the Terms when renting an unrelated property through Airbnb. (*Id.* ¶ 21; Kuehl Decl. (dkt. #23) ¶ 19.) However, neither Stephen Kuehl nor Mary Witte used their accounts to rent the cabin used by the extended Witte family in June 2024 and giving rise to the claims at issue here. (Kuehl Decl. (dkt. #23) ¶ 20; Witte Decl. (dkt. #24) ¶ 11.)

On June 30, 2024, while the extended Witte family was staying at the cabin rented by Charis, a devastating fire broke out around 2:30 A.M. (Dkt. #2-5, at 2.) Steven Witte, his daughters Lydia Witte and Charis Kuehl, Charis's five-year-old daughter S.K., and two other, non-party children were unable to escape the fast-moving flames and lost their lives. (*Id.*)

## OPINION

Defendant Airbnb moves to compel plaintiffs to arbitrate all their claims against it. The Federal Arbitration Act ("FAA") codifies a "liberal federal policy favoring arbitration." *Dr. Robert L. Meinders, D.C., Ltd. v. UnitedHealthcare, Inc.*, 800 F.3d 853, 856–57 (7th Cir. 2015) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011)); 9 U.S.C. § 2.

[8] Stephen Kuehl agreed to Version 11 on July 7, 2021, and Mary Witte agreed to version 14, on May 23, 2024. (Pfeiffer Decl. (dkt. #9) ¶¶ 16, 23.)

"The FAA operates to place arbitration agreements on the same footing as other contracts to ensure that judiciaries enforce agreements to arbitrate." *Id.* (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991); *Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 219 (1985)).

The court reviews a motion to compel arbitration in the same way as a motion for summary judgment, considering all evidence in the record and drawing all reasonable inferences in favor of plaintiffs as the non-moving parties. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). To prevail on its motion to compel arbitration, defendant Airbnb must establish the existence and validity of an agreement to arbitrate as to each plaintiff. *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1050 (7th Cir. 2020) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

Contrary to Airbnb's suggestion, deciding "whether the parties have a valid agreement to arbitrate at all" is a question for this court, not an arbitrator. *Bigger*, 947 F.3d at 1051 (quoting *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003)); *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416–17 (2019)); *see also*, David Horton, *Accidental Arbitration*, 102 Wash. U. L. Rev. 1381, 1392 (2025) ("[B]ecause arbitration flows from consent, it would be circular to allow the arbitrator to determine whether the plaintiff agreed to arbitrate.") In doing so, the court must apply ordinary state-law contract principles as relevant to each plaintiff. *Dr. Robert L. Meinders*, 800 F.3d at 856–57 ("In determining whether a valid arbitration agreement exists between the parties, a federal court should look to the state law that ordinarily governs formation of contracts.") (citing

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). The court addresses the parties' arguments in turn.

## I. Signatories to an Arbitration Agreement with Airbnb

Defendant Airbnb contends that three of the eight plaintiffs should be treated as signatories to Airbnb's Terms of Service Agreement for the purposes of its motion to compel arbitration: plaintiffs Charis Kuehl, Stephen Kuehl, and Mary Witte. Of these three plaintiffs, Charis Kuehl is the only one who actually used her Airbnb account to book the cabin where all of the plaintiffs' injuries occurred. Though Stephen Kuehl and Mary Witte had Airbnb accounts, agreeing to the Terms of Service when creating their accounts, they did *not* use those accounts to rent the cabin at issue, nor were their accounts otherwise expressly affiliated with that rental. Plaintiffs argue that since neither Stephen nor Mary used their Airbnb accounts to rent the cabin, their purported acceptance of Airbnb's Terms of Service Agreement when creating their accounts are entirely unrelated and did not apply to the cabin at issue.

The court agrees with plaintiffs. Arbitration "is a matter of consent, not coercion." *Moritz v. Universal City Studios LLC*, 54 Cal. App. 5th 238, 245 (2020) (quoting *Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Jr. U.* 489 U.S. 468, 479 (1989)). "An arbitration agreement is tied to the underlying contract containing it and is enforced 'only where a dispute has its real source in the contract.'" *Matthew-Ajayi v. Airbnb, Inc.*, No. CV ADC-23-3035, 2024 WL 1769186, at *2 (D. Md. Apr. 24, 2024) (quoting *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 205 (1991)). "Arbitration of a claim is appropriate 'only where the court is satisfied that the parties agreed to arbitrate *that dispute*.'" *Moritz*, 54 Cal. App.

5th at 246 (citing *Granite Rock Co. v. Teamsters,* 561 U.S. 287, 297 (2010)) (emphasis in original); *see also Banc of California, Nat'l Assn. v. Superior Ct*., 69 Cal. App. 5th 357, 369, 284 Cal. Rptr. 3d 484, 493 (2021) ("[W]here the party moving to compel arbitration asserts a different contract with an arbitration provision shows the parties' intent to arbitrate, the question of the parties' intent is for the court to resolve.") (quoting *Bautista v. Fantasy Activewear, Inc*., 52 Cal. App. 5th 650, 656, 265 Cal. Rptr. 3d 389 (2020)).

Here, Charis was the *only* plaintiff that booked the cabin and agreed to be subject to Airbnb's Terms for that rental. Thus, this dispute arises from *her* agreement with Airbnb. Plaintiffs Stephen Kuehl and Mary Witte's claims arise only from their stay at the property that Charis booked *and* not from their own use of "the Airbnb platform when booking or attempting to book properties." *Peterson v. Devit*a, 2023 IL App (1st) 230356, ¶¶ 28, 35, 237 N.E.3d 1010, 1016–1017 ("[An] arbitration provision should apply only when the claims arise from a plaintiff's use of the Airbnb platform and not on the fortuity of a plaintiff having created an account. . . . A contract—and not fate—dictates arbitrability."); *see also Airbnb, Inc. v. Rice*, 138 Nev. 682, 687, 518 P.3d 88, 93 (2022) (Stiglich, J., dissenting) (describing that Airbnb's position that all account holders must arbitrate *any and all* claims against it "will lead to absurd consequences in the future, . . . [where] the tort law claims that undergird the dispute did not arise out of a contract between" those account holders and Airbnb). At minimum, such absurdly broad consequences should have been spelled out in the Terms of Service Agreement, since an average reader would not be reasonably expected to understand the scope of their agreement merely to gain access to Airbnb listings binds as one to apply to all dealings with Airbnb for all purposes for all

time, even if the reader never did more than review listings out of idle curiosity. Further, at the point of entry for "signing up" for that limited purpose, the screen shot does not even disclose that one of the agreed upon terms is binding arbitration for any and all claims.

Additionally, Airbnb contends that *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 72 (2019), compels the court to refer to the arbitrator the initial question of whether Stephen and Mary, as Airbnb account holders, agreed to arbitrate this dispute. However, neither *Schein* nor California law, which Airbnb asks the court to apply, compels this result.[9] As the California Court of Appeals explained in applying *Schein*, "parties may delegate threshold arbitrability questions to the arbitrator so long as the parties' agreement does so by 'clear and unmistakable' evidence," even if the arbitrability question raised is "wholly groundless." *Moritz*, 54 Cal. App. 5th at 247 (quoting *Schein*, 586 U.S. at 69–70).

> But *Schein* presupposes a dispute *arising out of* the contract or transaction, *i.e.*, some minimal connection between the contract and the dispute. That is so because under the FAA, contractual arbitration clauses are "valid, irrevocable, and enforceable" if they purport to require arbitration of any "controversy thereafter arising out of such contract." 9 U.S.C. § 2. *Schein* expressly understood that the act requires enforcement of arbitration clauses with respect to disputes "'thereafter arising out of such contract.'" *Schein*, 586 U.S. at 67 (quoting 9 U.S.C. § 2). The FAA requires no enforcement of an arbitration provision with respect to disputes unrelated to the contract in which the provision appears. [Defendants]' argument that an arbitration provision creates a perpetual obligation to arbitrate any conceivable claim that [plaintiffs] might ever have against them is plainly inconsistent with the FAA's explicit relatedness requirement.

*Moritz*, 54 Cal. App. 5th at 248 (emphasis added); *see also Tao v. Murphy*, 812 F. Supp. 3d 1117, 1125 (D. Nev. 2025) ("As no agreement to arbitrate *this* dispute was formed, the

---

[9] Without deciding whether Wisconsin law applies, the court finds no support for Airbnb's position under that state's law either.

delegation clause in Airbnb's terms of service has no effect.") (emphasis added).

This court likewise declines to hold that the mere creation of an Airbnb account alone creates a "perpetual obligation to arbitrate" all claims against Airbnb. *Moritz*, 54 Cal. App. 5th at 248; *see also Smith v. Steinkamp*, 318 F.3d 775, 777 (7th Cir. 2003) (holding that if an arbitration agreement is "read as standing free from [the underlying contract], absurd results ensue"). Again, this conclusion is bolstered by the facts that nothing in the entry screen page, nor even in the Terms of Service itself warns or otherwise gives notice to signatories of ordinary intelligence of Airbnb's non-intuitive interpretation of the vast breadth of its arbitration provision merely for the privilege of pursuing available rental properties.

A far more reasonable interpretation limits Airbnb's right to compel arbitration to events arising out of a signatory's actual rental of a specific property. No doubt, this is why Airbnb requires an additional agreement at that time, rather than rely on the agreement upon a signatory's entrance into its website, however much it may wish to push the limits of the original sign off as a litigation strategy. Until then, it follows that the "Terms of Service" referred to in the screen shot govern only the account holders' interactions with Airbnb while browsing on its platform, until they book a rental property. Thus, for purposes of Airbnb's motion to compel arbitration of all events arising from the June 2024 fire, the court will not treat Stephen Kuehl or Mary Witte as signatories to the Terms of Service Agreement.

Airbnb again overreaches in contending that Charis Kuehl bound herself to the Terms of Service Agreement in perpetuity and for all conceivable interactions between

Airbnb and herself, including specifically to its arbitration clause, when she merely consented to create her Airbnb account. Nonetheless, she is unquestionably a signatory to Airbnb's Terms of Service Agreement for purposes of its motion to compel arbitration, having manifested at least her passive assent to the agreement's terms for purposes of her use of the cabin and binding her to arbitration under California law.[10] Indeed, for online transactions like this one, many companies "'rely on simply displaying' somewhere on a webpage 'a notice of deemed acquiescence and a link'" to the contractual terms of conducting business with that company. *Domer v. Menard, Inc.*, 116 F.4th 686, 695 (7th Cir. 2024) (applying Wisconsin law).

In this context, consumers are deemed to have provided their "passive" assent to terms and conditions by continuing with the transaction. Such passive assent creates an enforceable contract between the company and the consumer "only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id*. (citing *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (applying California law)). Both of these requirements appear satisfied here.

### A. Reasonably conspicuous notice

When determining whether a company's webpage provides reasonably conspicuous notice of the terms intended to bind its consumers, courts consider five factors: "(1) the

[10] The parties dispute whether California or Wisconsin law should apply, but the outcome is the same under either standard, so the court sets aside the choice of law question for now.

simplicity of the screen; (2) the clarity of the disclosure; (3) the size and coloring of the disclosure's font; (4) the spatial placement of the hyperlink; and (5) the temporal relationship to the user's action." *Id.* The court addresses each factor in order.

**1. Simplicity of the screen**

Ideally, for a company to provide conspicuous notice of its terms, this factor would require that the reader be forced to click *and* review the terms on the screen, even if it only means the reader must manually scroll through the terms, rather than *actually* read them. However, current law in most states requires only that a company's webpage be simple enough for the eye to be *drawn to the terms*, rather than likely to skip past them. *See Domer*, 116 F.4th at 696. Where a webpage uses a simple, uncluttered design and contains only a few fields, one of which discloses the terms, those terms are deemed reasonably conspicuous to the consumer. *Id.*[11] In contrast, only where a webpage uses multiple fonts, provides a multitude of information, contains extraneous elements, and includes a high number of hyperlinks (e.g., upwards of 15) is the screen not sufficiently simple to put the consumer on notice that the transaction requires agreeing to terms. *Id*. (citing *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 236–38 (2d Cir. 2016)).

Here, Airbnb's account creation page has only four fields with short descriptions below them, including the disclosure of 'Terms of Service' and an 'Agree and Continue'

[11] *E.g., Domer*, 116 F.4th at 696 ("The Menards page is streamlined, well-spaced, and internally consistent. There is ample white space; nearly all the text and images on the screen are pertinent to the checkout process; and the page is organized into just a few neat boxes and columns... And the page is not littered with dozens (or even a handful) of hyperlinks. The page has a consistent color and typeface, and only a few items are presented in bold type. So, those items—including the disclosure of the Terms of Order—are likely to catch a user's attention. The district court correctly found that the Terms of Order were reasonably conspicuous in this uncluttered presentation.").

button in an attention-grabbing color. The page otherwise uses consistent font and coloring throughout. Indeed, the *only* in-text, bolded terms are 'Agree and Continue' and the hyperlinks to applicable terms and policies. In fairness, the page contains four, contract hyperlinks listed in succession, but the page as a whole is sufficiently uncluttered, such that a reasonable consumer's eye is likely to land on the first hyperlink for 'Terms of Service' before clicking 'Agree and Continue' button. *Domer*, 116 F.4th at 695 ("We examine notice from the perspective of a reasonable online shopper—that is, a person who is neither an expert nor a novice with technology… [which] permits certain basic, objective assumptions regarding the user's familiarity with commercial websites, hyperlinks, and online contracts, regardless of subjective experience.") For these reasons, this factor favors Airbnb's position that it provided reasonably conspicuous notice of its terms to Charis Kuehl when she entered into her Airbnb account.[12]

**2. Clarity of the disclosure**

Next, a company must clearly disclose its terms such that a reasonable consumer would understand that its terms apply to the transaction and are available through a hyperlink. *Id.* at 697 (citing *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016)). Where the terms are introduced by a bolded, eye-catching phrase informing the consumer of the contractual consequences of the transaction, the disclosure is more likely to be clear to the consumer. *Id*. In using a hyperlink, the terms must also appear on the page in a way that makes the hyperlink's presence readily apparent. *Berman v. Freedom Fin.*

[12] Ideally, this first screen would have included a notice of agreement to arbitrate, but that *is* disclosed relatively prominently on the page of the Terms of Service itself, which appears sufficient under California law in particular.

*Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022). Finally, underlined, bolded letters are likely to make the hyperlink apparent to the consumer, particularly where it is contrasted by a white background, other text on the page is in a dissimilar color, and the hyperlink sits within the fields that the consumer must engage with to complete the transaction, rather than far below it. *Id.*; *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 477 (9th Cir. 2024); *Domer*, 116 F.4th at 697.

Applying this criteria, Airbnb's account creation page sufficiently discloses its 'Terms of Service.' The Terms are introduced in a sentence with bolded text on the page, reading: "By selecting **Agree and Continue**, I agree to Airbnb's **Terms of Service**…" Further, the Terms are listed in bold, distinct blue and underlined font that stands in contrast to the black and gray lettering on the rest of the page. While the text is slightly smaller than the titles of each field and the 'Agree and Continue' button, the font is large enough to be easily legible as compared to the rest of the page. While the disclosure sits under the four fields that the consumer must fill out, it is directly above the button that reads 'Agree and Continue.' Overall, therefore, a reasonable consumer's eye is likely to land on the disclosure sentence before clicking to the next page; the reasonable consumer would understand the sentence to mean that creating an account to rent an Airbnb unit requires accepting the Terms; *and* the Terms' font would alert the consumer that they are available via hyperlink. Again, this factor favors Airbnb.

**3. Spatial placement of the hyperlink.**

"Text advising users of terms should be spatially coupled with the act deemed to manifest assent to those terms." *Domer*, 116 F.4th at 698. Terms are "spatially coupled"

with the assenting action when both appear next to each other on the webpage, and scrolling is not necessary to go between them. *Id.* Here again, the disclosure appears immediately above the 'Agree and Continue' button, and as an iPhone user, Charis would not have needed to scroll to see the hyperlink to the Terms of Service before clicking 'Agree and Continue.' *See also Selden v. Airbnb, Inc.*, 4 F.4th 148, 156–57 (D.C. Cir. 2021) (the disclosure "appeared on a single screen for an iPhone user like [plaintiff] and required no scrolling to see the notice of the Terms of Service.") Thus, the spatial placement of the hyperlink also indicates that Airbnb provided reasonably conspicuous notice of its Terms.

**4. Size and coloring of the disclosure's font.**

As discussed, a disclosure is reasonably conspicuous when it is written in a legible font size and in a color that contrasts the background and other fonts on the screen. *Domer*, 116 F.4th at 697. Here, the disclosure's text is smaller than the field titles, *but* it is the same size as other descriptive text on the page and easily legible. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017). More importantly, 'Agree and Continue' is bolded in black, contrasting the white background, and the hyperlink to the Terms of Service is blue, bolded, and underlined. As "the disclosure and hyperlinks are readable and distinct from the surrounding text," this factor, too, favors a finding that Airbnb provided reasonably conspicuous notice of its Terms on the registration page. *Domer*, 116 F.4th at 698; *see also Selden*, 4 F.4th at 157 ("As the district court explained, Airbnb's notice was 'clearly legible, appropriately sized, and unobscured by other visual elements.'") (citation omitted).

**5. Temporal relationship to the user's action.**

This last factor asks whether the terms are presented "at a place and time that the

consumer will associate with the initial purchase or enrollment, or the use of, the goods or services from which the recipient benefits." *Meyer*, 868 F.3d at 78 (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012)). Where the terms are provided "simultaneously to enrollment" on a company's platform, a "reasonably prudent smartphone user would understand that the terms were connected to the creation of a user account," and the subsequent use of that account to obtain the company's services. *Id.* at 78–79.[13]

Here, Airbnb disclosed its Terms at the same time Charis created her account, then again, and more importantly, when she actually used Airbnb's software platform to rent the subject cabin. Although a user can create an account far before actually booking a property (as Charis did here), and would not necessarily understand after just creating an account that the Terms of Service would apply to more than using the account to peruse possible bookings for an Airbnb property, a reasonable consumer should certainly understand its application when entering into the rental agreement for a property itself. *Id.*; *see also Selden*, 4 F.4th at 157 ("A reasonable person would know that, by signing up, he would be agreeing to Airbnb's terms."). Therefore, this factor further "weighs in favor of… finding fair notice." *Domer*, 116 F.4th at 699.[14]

---

[13] Both the Seventh Circuit (applying Wisconsin law) and the Ninth Circuit (applying California law) rely on *Meyer*'s test for passive assent. *Domer*, 116 F.4th at 695; *Patrick*, 93 F.4th at 476.

[14] Requiring users to reaffirm their agreement to the Terms when they actually book a property, like Charis Kuehl did when booking the property at issue (Pfeiffer Decl. (dkt. #9) ¶¶ 14), is enough to mitigate the temporal disconnect from account creation to cabin rental. However, the parties do not provide information about that agreement page or discuss its details, so the court can only find the second affirmation supports temporal fair notice.

"To summarize on this first prong of whether an agreement was made when assent is passive," the Airbnb account creation page "provided reasonably conspicuous notice of the terms to which the consumer will be bound," when using that account to book a rental. *Id.* This is particularly true here as Charis was required to renew her assent to the Terms of Service at the time of booking the rental, such that she must arbitrate disputes with Airbnb arising out of that rental. Therefore, Airbnb satisfies the first prong of the test to create an enforceable arbitration contract with Charis Kuehl through passive assent.

**B. Unambiguous manifestation of assent**

A consumer's "click of a button" unambiguously manifests her assent to the company's terms "only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Patrick*, 93 F.4th at 477 (quoting *Berman*, 30 F.4th at 857.) Here, this assent was reasonably conspicuous and described by requiring an affirmative click on the "Agree and Continue" button as evincing a registrant's agreement to the Terms. *Domer*, 116 F.4th at 699. Indeed, that the button was labelled "***Agree*** **and Continue**" emphasized for Charis and any other registrant that clicking it manifested her agreement to the Terms of Service, whether reviewed or not. (Dkt. #9-4.) (italics added).

Because Charis unambiguously manifested her assent, she is bound by the Terms, even if she elected not to actually review them, much less knowingly agreed to an arbitration provision. *See Meyer*, 868 F.3d at 79 ("While it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice.") Thus, because Airbnb's 'Terms of Service' were reasonably

conspicuous on its account creation page, and Charis Kuehl unambiguously manifested her assent to those Terms by clicking 'Agree and Continue,' in creating her account *and* again by agreeing when renting the subject cabin, she agreed to arbitrate any dispute arising out of her rental and use of the cabin.

## II. Charis's Acceptance of the Terms Also Binds Other, Nonsignatory Plaintiffs Over Whom She Had Agency

Next, Airbnb contends that all remaining nonsignatory plaintiffs are also bound to arbitrate their claims by virtue of Charis's signature. "The general rule, of course, is that an arbitration agreement binds only the parties to that agreement." *Dr. Robert L. Meinders, D.C., Ltd. v. UnitedHealthcare, Inc*., 800 F.3d 853, 856–57 (7th Cir. 2015). Nonetheless, under traditional state-law contract principles, an arbitration agreement may in some cases bind nonsignatories. *See Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 630–31 (2009); *Coatney v. Ancestry.com DNA, LLC*, 93 F.4th 1014, 1019 (7th Cir. 2024) ("State law typically provides only for a handful of limited exceptions to the general prohibition against binding nonsignatories: '(1) assumption, (2) agency, (3) estoppel, (4) veil piercing, and (5) incorporation by reference.'") (citations omitted).

Airbnb argues that principles of agency or equitable estoppel should apply to all nonsignatory plaintiffs and bind them to arbitration. Additionally, it argues that the arbitrator should decide this question in the first instance. As to this latter point, the question of whether *non*signatories are bound to arbitrate by a signatory asks whether a contract to arbitrate has formed at all between those parties. Therefore, this is a question appropriately before the court, rather than the arbitrator. *See Doctor's Assocs., Inc. v.*

*Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019) ("[P]arties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place.") (citing *Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287, 299–301 (2010)). As to the larger question of which nonsignators are bound, the court considers Airbnb's arguments in turn -- first as to Charis Kuehl's minor children and spouse (N.K., V.K., S.K., and Stephen Kuehl), then as to the remaining adult, nonsignatory plaintiffs (Mary Witte, Steven Witte, and Lydia Witte).

### A. Nonsignatories N.K., S.K., V.K., and Stephen Kuehl are bound to arbitrate their claims

As a threshold matter, Airbnb argues that California law governs the question of whether Charis's arbitration agreement can be enforced against nonsignatories because the Terms of Service specifies that California law governs its substantive interpretation. Plaintiffs respond that the choice of law clause in the Agreement is inapplicable as to them as nonsignatories. Instead, they argue Wisconsin law should apply as the location of the subject rental cabin and all of the events giving rise to plaintiffs' claims. As to the substantive issue, plaintiffs also assert that under Wisconsin law, minor children: (1) do not have capacity to contract *or* (2) may disaffirm a contract at their will, and do so here. Either way, the nonsignatory minor children would not be bound to arbitrate.

At the outset, the court agrees with Airbnb that California law governs the question of the extent of Charis's power to bind nonsignatories to her agreement with Airbnb, as she is unquestionably bound by that agreement. Thus, California substantive law applies

to interpreting the reach of her binding agreement.[15]

California law recognizes that nonsignatory parties may be compelled to arbitrate "where a preexisting relationship existed between the nonsignatory and one of the parties to the arbitration agreement, making it equitable to compel the nonsignatory to also be bound to arbitrate his or her claim." *Crowley Mar. Corp. v. Bos. Old Colony Ins. Co.*, 158 Cal. App. 4th 1061, 1070 (2008). These preexisting relationships include both a parent's relationship with her minor child and the relationship between spouses. *See Matthau v. Superior Ct.*, 151 Cal. App. 4th 593, 600, 60 Cal. Rptr. 3d 93, 98 (2007) "[A] 'preexisting relationship'—such as spouses and children…—supports the implied authority of the [signatory] party to bind the nonsignatory)."[16] *Id.* In particular, where a minor child or a

[15] To the degree that a choice-of-law analysis were required, the court still concludes that California law should apply here under Wisconsin's choice-of-law rules for contract disputes. *Contrast, e.g., Harper v. TCC Wireless, LLC*, 813 F. Supp. 3d 894, 901 (E.D. Wis. 2025) (deciding under Wisconsin choice-of-law rules, Wisconsin law applied). Unless the requested application of a particular states' law could be considered "officious intermeddling" at the outset, Wisconsin requires its courts to employs a two-step choice of law analysis. *Beloit Liquidating Tr. v. Grade*, 2004 WI 39, ¶ 24, 270 Wis. 2d 356, 374, 677 N.W.2d 298, 307. Here, at the first step, the court assesses each state's contacts with the Terms of Service Agreement, including: (1) the place of negotiation (here, California); (2) place of contracting (unclear); (3) place of performance (California and Wisconsin); (4) the location of the subject of the contract (Wisconsin); (5) and the respective domiciles of the parties at the time of contracting (California and Ohio). *Utica Mut. Ins. Co. v. Klein & Son, Inc.*, 157 Wis.2d 552, 460 N.W.2d 763, 765–66 (Ct. App. 1990). These factors do not weigh heavily in favor of California or Wisconsin (or any other state), because the contacts that are clear from the record are split between California and Wisconsin. The second step assesses choice-influencing factors, including: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. *Beloit Liquidating Tr. v. Grade*, 2004 WI 39, ¶ 25. These factors weigh heavily towards California, as California has a far more robust body of law on the issue of binding nonsignatory family members to contracts. In this way, California's law enhances the predictability of results, improves maintenance of interstate order, and simplifies the judicial task.

[16] Plaintiffs themselves do not dispute "the general notion that as the mother of S.K., V.K., and N.K., there existed an agency relationship between Charis and her children." Pl.'s Resp. Br. (dkt. #22) at 14.

spouse derives some benefit from the signatory's agreement, even if that benefit was minimal, courts interpreting California law have generally bound them to an arbitration obligation. *E.g., S.G. v. Epic Games, Inc.,* 796 F. Supp. 3d 614, 620–21 (N.D. Cal. 2025); *A.A. v. Roku, Inc*., No. 25-CV-06284-NW, 2026 WL 1349064, at *3–*4 (N.D. Cal. May 14, 2026); *see also Chan v. Charter Commc'ns Holding Co.*, No. EDCV150886JGBKKX, 2015 WL 12655701, at *5 (C.D. Cal. Aug. 6, 2015) ("an arbitration clause often applies to the spouse and children of the signatory").

Under plaintiffs' own recital of the facts here, Charis Kuehl rented the subject cabin, at least in part, to spend time with her husband Stephen and their children, N.K., V.K., and S.K., and her immediate family did indeed stay at the cabin before the fire giving rise to their claims. Compl. (Dkt. #2-1) ¶¶ 44, 49, 52. In this way, the undisputed record shows that the Kuehl family initially derived a 'benefit' from Charis's agreement to rent the cabin. *See S.G. v. Epic Games*, 796 F. Supp. 3d at 621 ("[California] courts have compelled the child to arbitrate particularly where the parent entered the agreement at least in part for the child's benefit."). As plaintiffs repeatedly emphasize, the tragedy that ultimately befell the family unquestionably far eclipsed any contract 'benefit' they received, but a benefit *was* conferred at the time of contracting and initially in their subsequent stay. Thus, the undisputed record shows that Charis Kuehl's minor children, N.K., V.K., and S.K., and her spouse Stephen Kuehl all "minimally benefitted" from her written agreement to arbitrate any disputes arising out of their stay. Accordingly, these nonsignatory plaintiffs' preexisting relationships with Charis support a finding that she acted as their agent when booking the cabin, and thus, California law dictates that they are bound to the

agreement and must arbitrate their claims against Airbnb, including claims arising out of the fire.[17]

### B. Nonsignatories Mary Witte, Steven Witte, and Lydia Witte are not bound to arbitrate their claims

This leaves the question of whether Charis's agreement to arbitrate binds the remaining nonsignatory plaintiffs -- Mary, Steven and Lydia Witte ("the Witte plaintiffs"). While these plaintiffs are Charis's adult parents and sister, those familial relationships are not legally considered "preexisting relationships" in the way a spouse or minor child might be. *See Buckner v. Tamarin*, 98 Cal. App. 4th 140, 143, 119 Cal. Rptr. 2d 489, 491 (2002) ("The [signatory] decedent's right to bind [her spouse and minor children] to arbitration

[17] Plaintiffs concede, and this court agrees, that "Wisconsin courts appear not to have decided the specific issue of whether a minor can be compelled to arbitrate a claim based on an agreement allegedly entered into by their parent." (Pls.' Resp. Br. (Dkt. #22) at 15.) Nonetheless, federal courts have interpreted Wisconsin law to allow signatories to enforce contract clauses against nonsignatory minors where their parent enters the contract for their benefit:

> Under Wisconsin law, a minor does not have legal capacity to contract. *Withers v. Tucker*, 145 N.W.2d 665, 667 (Wis. 1966). In light of this, Wisconsin courts have recognized that parents may bind their children to a contract when, for example, the contract is executed on the child's behalf. See *Fire Ins. Exch*. v. Cincinnati Ins. Co., 610 N.W.2d 98, 102, 107 (Wis. Ct. App. 2000) . . . Importantly, *the Fire Insurance Exchange* court assumed that a parent's signature on a contract regarding her son was sufficient to bind her son.

*Warner v. St. John's Nw. Mil. Acad. Inc*., No. 18-CV-730-JPS, 2019 WL 403718, at *5 (E.D. Wis. Jan. 31, 2019). Given that Charis's agreement to the Terms was at least in part for the benefit of her minor children, Wisconsin law would likely compel the same outcome here.

Furthermore, the spousal relationship in Wisconsin creates a rebuttable presumption of agency in contract formation, particularly where one spouse "had knowledge of the negotiations by [his spouse] and made no objections thereto." *Schlueter v. Hubred*, 2004 WI App 109, ¶ 21, 273 Wis. 2d 785, 680 N.W.2d 832 (citing *Smith v. Osborn*, 66 Wis.2d 264, 278, 223 N.W.2d 913 (1974)). Given that Charis paid over $10,000 for the cabin at issue and then brought her spouse and children there for vacation, "the circumstances of the parties' relationships here permit the reasonable inference that [Stephen] knew about [Charis]'s agreement with [Airbnb] and did not object to it. Likewise, the facts of this case raise the reasonable inference that [Charis] had authority to act as [Stephen]'s agent" for the purpose of entering into the contract with Airbnb. *Id.* ¶ 24.

rested on well-grounded legal principles involving spouses and parents and children. For the third group, however—adult [family members]—the decedent had no authority to act.") Nevertheless, Airbnb argues that principles of agency or equitable estoppel bind the Witte plaintiffs to the arbitration agreement. Under California law, however, none of these theories work to bind the Witte plaintiffs to arbitrate their claims.[18]

**i. Agency**

Airbnb first argues that Charis Kuehl acted as the Witte plaintiffs' agent when booking the cabin through its website. Under California law, an agent acting within the scope of an agency relationship may bind her principle to an arbitration agreement. *Indep. Living Res. Ctr. San Francisco v. Uber Techs., Inc.*, 2019 WL 3430656, at *3 (N.D. Cal. July 30, 2019); *see also* Cal. Civ. Code § 2330 ("An agent represents his principal for all purposes within the scope of his actual or ostensible authority, and all the rights and liabilities which would accrue to the agent from transactions within such limit, if they had been entered into on his own account, accrue to the principal."). However, the scope of an agent's authority depends on the nature of authority conferred on the agent:

> An agent has such authority as a principal actually or ostensibly confers upon him. Actual authority is such as a principal intentionally confers upon an agent, or intentionally or by want of ordinary care allows the agent to believe himself to possess. Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess.

*West v. Solar Mosaic LLC*, 105 Cal. App. 5th 985, 994, 326 Cal. Rptr. 3d 383, 391 (2024).

Whether an agency relationship exists at all is a question of fact. *Indep. Living*, at *3.

[18] Wisconsin law, which plaintiffs urge the court to apply to this analysis as well, does not support binding the Witte plaintiffs to Charis's arbitration agreement. *See discussion, infra*, notes 19 & 21.

"Agency may be created, and authority conferred, by a principal's subsequent ratification of an agent's conduct," and such conduct alone can be sufficient to create an agency relationship. *Id.*; *West*, 105 Cal. App. 5th at 994. Nonetheless, "[o]rdinarily, the law requires that a principal be apprised of all the facts surrounding a transaction before he will be held to have ratified the unauthorized acts of an agent." *West*, 105 Cal. App. 5th at 994. "Every California case finding nonsignatories to be bound to arbitrate [under an agency theory] is based on facts that demonstrate, in one way or another, the signatory's implicit authority to act on behalf of the nonsignatory." *Pillar Project AG v. Payward Ventures, Inc.*, 64 Cal. App. 5th 671, 676, 279 Cal. Rptr. 3d 117, 121–22 (2021).

Here, drawing all reasonable inferences in favor of plaintiffs, as the court must, the record does not support a finding that the Witte plaintiffs conferred actual authority on Charis Kuehl to act as their agent and enter into an agreement with Airbnb on their behalf, much less binding them to arbitrate disputes that may arise. Nor is there *any* evidence that Charis believed that she was acting as the Witte plaintiffs' agent when agreeing to arbitrate her own claims. Finally, the Terms of Charis's agreement to rent through Airbnb says nothing about her authority to bind others staying at the cabin, nor give it reason to believe she had that authority. Therefore, the court cannot conclude that Charis had actual authority to act as the Witte plaintiffs' agent. *E.g., Peterson v. Devita*, 2023 IL App (1st) 230356, ¶ 42, 237 N.E.3d 1010, 1019 ("Airbnb would have to establish that [the nonsignatory plaintiff] authorized [the signatory], and nothing in the record shows that [the nonsignatory plaintiff] authorized [the signatory] to make the reservation on his

behalf. And while the reservation indicated nine guests, it did not list [the nonsignatory plaintiff].").

Likewise, the evidence in the record does *not* support any finding that Charis had ostensible authority to act as the Witte plaintiffs' agent. In particular, there is no indication that the Witte plaintiffs did anything to cause Airbnb to believe reasonably that Charis Kuehl acted as their agent when she entered the arbitration agreement. Nor does Airbnb contend it had any knowledge that the Witte plaintiffs were affiliated with the rental cabin until after the fire. Further, Mary Witte, on behalf of herself, her husband Stephen, and her daughter Lydia *disclaim* any knowledge of the Terms generally or arbitration agreement specifically at the time of the rental, weighing against an inference that the Witte plaintiffs later somehow ratified that agreement. Witte Decl. (Dkt. #24) ¶¶ 3-12. For these reasons, the Witte plaintiffs are not legally bound to arbitrate their claims against Airbnb under an agency theory.

Finally, Airbnb argues that the Witte plaintiffs' mere use of the cabin, by itself, is sufficient to support an inference that Chris Kuehl acted as their agent when she agreed to Airbnb's Terms. Tellingly, Airbnb does not cite, and the court could not find, any binding California common law or statutory law that would support holding a single family member's personal signature on an agreement covering only "you" somehow creates an agency relationship on an entire travel group as a matter of law. Moreover, general principles of California agency law similarly do not support such a low threshold for agency formation. Cal. Civ. Prac. Bus. Lit. § 36:3, *Creation and existence of agency relationship* ("The law indulges in no presumption that an agency exists but, instead, presumes that a person

is acting for himself or herself and not as an agent for another.") (citing *Jackson v. AEG Live, LLC*, 233 Cal. App. 4th 1156, 183 Cal. Rptr. 3d 394 (2d Dist. 2015)). Thus, that the plaintiffs all vacationed together, by itself, "is not evidence that [Charis] had the authority to enter into arbitration agreements (or other contracts) on [the Witte] Plaintiffs' behalf." *Pillar Project*, at 64 Cal. App. 5th at 676.[19]

**ii. Equitable Estoppel**

Airbnb next argues that principles of equitable estoppel should bind the Witte plaintiffs to the arbitration agreement, principally based on its reading of *Hofer v. Emley*, 2019 WL 4575389, at *6 (N.D. Cal. Sept. 20, 2019). Specifically, Airbnb argues that the Witte plaintiffs, "as nonsignator[ies] knowingly received benefits flowing directly from" Charis's agreement to the Terms of the Service Agreement and, therefore, must accept all of the terms of the agreement. *Id.* Airbnb further cites to *Durham v. Airbnb, Inc.*, 2025 WL 675319, at *3 (D. Md. Mar. 3, 2025), which held that a nonsignatory Airbnb guest must arbitrate as "he cannot use the existence of the [Terms] to further his negligence claim against Airbnb while avoiding the less desirable terms of the contract."[20] Of course, here,

[19] Similarly, "Wisconsin law of agency requires 'an agreement of two parties, embodying three factual elements: (1) the manifestation of the principal that the agent is to act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to control the undertaking.'" *Scheurer v. Fromm Fam. Foods LLC*, 863 F.3d 748, 755, n.4 (7th Cir. 2017) (citing Wis. JI-Civil 4000; *Arsand v. City of Franklin*, 83 Wis.2d 40, 264 N.W.2d 579, 581 (1978)). Thus, even if the court were to apply Wisconsin law, the record does not support that an agency relationship was established between Charis and the Witte plaintiffs for the same reasons that one was not established under California law. *Contrast, e.g., Jerneb Acquisition Corp. II v. Partner Assessment Corp.,* 2022 WI App 8, ¶ 14, 971 N.W.2d 199 ("[The nonsignatories] made numerous claims that [the signatory] was acting as their agent in the contractual relationship with [the other signatory]... Therefore, we conclude that [the nonsignatory] was bound under the Agreement.")

[20] *Durham* also rests its holding on an agency theory, which as previously explained, this court rejects applying to Charis acting as the Witte plaintiffs' agent.

the Witte nonsignatories do not make a claim under, much less seek to enforce, some provision of a contract between them and Airbnb, nor even under a negligence theory is it obvious that Airbnb would not owe some standard of care to foreseeable invitees of renters, though that is not yet the question before this court.

Regardless, Airbnb's arguments, and the legal opinions on which they rely, appear to conflate two distinct theories under which a nonsignatory may be legally bound to an arbitration agreement under California law, neither of which apply on the facts here. The first is that a nonsignatory may be bound to arbitration when she is a third-party beneficiary of an agreement containing an arbitration clause. "The test for determining whether a contract was made for the benefit of a third person is whether an intent to benefit a third person appears from the terms of the contract. The mere fact that a contract results in benefits to a third party does not render that party a 'third party beneficiary.'" *Pillar Project*, 64 Cal. App. 5th at 677 (cleaned up) (citing *Jensen v. U-Haul Co. of California* 18 Cal. App. 5th 295, 301–302, 226 Cal. Rptr. 3d 797 (2017)). Here, while the "agreement at issue contemplates the possibility that" other persons could stay at an Airbnb rented by Charis, "[n]othing in the terms of the agreement … demonstrates any express intent to benefit a third party," much less the Witte plaintiffs specifically. *Jensen*, 18 Cal. App. 5th at 302.

As to the remaining theory of equitable estoppel, the weight of California authority directly contradicts Airbnb's position. For the court to enforce an arbitration agreement as to the nonsignatory Witte plaintiffs based on equitable estoppel, their claim must "rely upon, make reference to, or [be] intertwined with claims under the subject contract." *Pillar*

*Project,* 64 Cal. App. 5th at 678 (citing *JSM Tuscany, LLC v. Superior Ct*., 193 Cal. App. 4th 1222, 1238, 123 Cal. Rptr. 3d 429, 442 (2011)). This means that "equitable estoppel is 'inapplicable where a plaintiff's allegations reveal no claim of any violation of any duty, obligation, term or condition' imposed by the contract." *Namisnak v. Uber Techs., Inc*., 971 F.3d 1088, 1095 (9th Cir. 2020) (citing *In re Henson*, 869 F.3d 1052, 1060 (9th Cir. 2017)) (applying California law).

In this case, the Witte plaintiffs' claims against Airbnb do not rely on the Terms of Service Agreement at all. Rather, they assert common law claims against Airbnb for negligence and negligent infliction of emotional distress, as well as claims under the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, for false advertisements, statements and representations regarding the safety of the cabin on their website. "None of [the] Terms and Conditions is mentioned in the operative complaint," and the alleged breach of duty was not imposed by the Terms of Service Agreement. *Namisnak*, 971 F.3d at 1095. Further, "[Airbnb] provides no evidence or authority establishing that Plaintiff's claims cannot survive absent reliance on the Terms of Service." *Pillar Project,* 64 Cal. App. 5th at 678.[21]

[21] Wisconsin law similarly does not support binding the nonsignatory Witte plaintiffs to the arbitration agreements under a theory of equitable estoppel. "There are four elements of equitable estoppel [under Wisconsin law]: (1) action or non-action; (2) on the part of one against whom estoppel is asserted; (3) which induces reasonable reliance thereon by the other, either in action or non-action; (4) which is to the relying party's detriment." *Harper v. TCC Wireless, LLC*, 813 F. Supp. 3d 894, 902 (E.D. Wis. 2025) (quoting *Affordable Erecting, Inc. v. Neosho Trompler, Inc*., 2006 WI 67, ¶33, 291 Wis. 2d 259, 715 N.W.2d 620). Here, there is no evidence in the record that the Witte plaintiffs induced Airbnb's *reasonable* reliance on the Terms of Service Agreement with Charis Kuehl. Thus, equitable estoppel is likewise inapposite under Wisconsin law.

At bottom, the thrust of Airbnb's argument for equitable estoppel is that the Witte plaintiffs could not have stayed at the cabin at issue but for Charis's agreement to the Terms of Service Agreement. In considering whether equitable estoppel should bind nonsignatory plaintiffs to an agreement to arbitrate, however, "the analysis is not a simple 'but for' test … [rather, it is] whether plaintiffs' claims demonstrate 'actual reliance on the terms of the agreement to impose liability.'" *Pac. Fertility Cases*, 85 Cal. App. 5th 887, 896, 301 Cal. Rptr. 3d 611, 618 (2022) (citation omitted). As described above, the Witte plaintiffs' claims do not rely on any specific provision of the agreement's terms in making their claims. And, as discussed, the undefined term of "you" in the agreement says nothing expressly or implicitly about sweeping into that term anyone else who may be staying at the rental cabin, with Charis's consent. Therefore, the terms of the Service Agreement is not binding on nonsignatory plaintiffs Mary Witte, the estate of Steven Witte, or the estate of Lydia Witte, especially to compel them to arbitrate their claims.

**III. The Delegation Clause is Not Unconscionable**

Next, the Kuehl plaintiffs argue that the clause within the Terms that delegates to the arbitrator the question of whether their particular claims fall within scope of the agreement to arbitrate is unconscionable. The clause in question states: "If there is a dispute about whether this Arbitration Agreement can be enforced or applies to our Dispute, you and Airbnb agree that the arbitrator will decide that issue." (Dkt. #9-5, at § 23.4.)

While "parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence," the court

must determine whether "a valid agreement exists" as to delegation, including whether that agreement is invalid because it is unconscionable. *Henry Schein*, 586 U.S., at 69 (quoting *First Options*, 514 U.S., at 944); *see also Patrick*, 93 F.4th at 479 ("Section 2 of the FAA 'permits arbitration agreements to be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract."'") (quoting *Concepcion*, 563 U.S. at 339; 9 U.S.C. § 2).

Since Charis Kuehl is bound by the Terms of Service Agreement, and California law governs its substantive interpretation, the court again applies California law to decide whether the delegation provision is unconscionable.[22] Under California law, "the degree of unfairness required for unconscionability of an arbitration agreement must be as rigorous and demanding for arbitration clauses as for any other contract clause." 6 Cal. Jur. 3d Arbitration and Award § 46 (citing *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 251 Cal. Rptr. 3d 714, 447 P.3d 680 (Cal. 2019)). A provision must be both procedurally and substantively unconscionable to be invalid. *Patrick*, 93 F.4th at 479 (citing *Sanchez v. Valencia Holding Co.*, 61 Cal.4th 899, 190 Cal. Rptr. 3d 812, 353 P.3d 741, 748 (2015)). California courts evaluate procedural and substantive unconscionability on a sliding scale; "in other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and

[22] Plaintiffs argue that the court should apply Wisconsin law as to unconscionability. However, Wisconsin evaluates both procedural and substantive unconscionability in largely the same way as California, so Wisconsin law would again compel the same result. *See, e.g., Anderson v. Select Portfolio Servicing, Inc.*, 2019 WL 1487584, at *2 (W.D. Wis. Apr. 4, 2019); *Wisconsin Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶ 33, 290 Wis. 2d 514, 533, 714 N.W.2d 155, 165.

vice versa." *Id*. (quoting *Sanchez*, 353 P.3d at 748.) Unfortunately for plaintiffs, both standards favor Airbnb.

**A. Procedural Unconscionability**

Procedural unconscionability addresses "oppression or surprise due to unequal bargaining power." *Sanchez*, 353 P.3d at 748. "'Oppression' is defined as an 'inequality of bargaining power resulting in no real negotiation and absence of meaningful choice,' and 'surprise' as to what occurs when 'the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms.'" *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 556 (S.D.N.Y. 2018) (applying California law) (quoting *Dean Witter Reynolds, Inc. v. Superior Court*, 211 Cal. App. 3d 758, 259 Cal. Rptr. 789, 795 (1989)).

Plaintiffs argue that presenting the Terms as an adhesion contract, without an explanation that a delegation clause is contained within, is procedurally unconscionable, particularly since the delegation clause is not attention-grabbing in itself and its language is confusing enough to be unduly oppressive. However, the fact that the clause was presented within a contract of adhesion does not necessarily make the clause unconscionable. *Lane v. Francis Cap. Mgmt. LLC*, 224 Cal. App. 4th 676, 689, 168 Cal. Rptr. 3d 800, 810 (2014). "Rather, an adhesion contract remains fully enforceable" unless other factors contribute to its procedural and/or substantive unconscionability. *Id.* (quoting *Fittante v. Palm Springs Motors, Inc.*, 105 Cal.App.4th 708, 722, 129 Cal.Rptr.2d 659 (2003).) Most importantly, "there can be no oppression establishing procedural unconscionability, even assuming unequal bargaining power and an adhesion contract,

when the customer has meaningful choices" beyond that particular adhesion contract to obtain similar services. *Wayne v. Staples, Inc.*, 135 Cal. App. 4th 466, 482, 37 Cal. Rptr. 3d 544, 556 (2006); *see also Plazza*, 289 F. Supp. 3d at 558 ("Plaintiffs did have the option of 'simply foregoing the activity,' . . . . [or p]laintiffs could have opted to use other websites that offer similar apartment rental services."). Certainly, Charis had other choices as to rental services.

Ignoring Airbnb's unfortunate practice at the time of not requiring a click through the Terms of Service Agreement itself and the failure to disclose that agreement contains an arbitration clause until then, the agreement *begins* with a notice to the user of that clause. (Dkt. #9-5, at 2.) Moreover, within the arbitration clause, the delegation provision is one of two, bolded sentences. *See* (Dkt. #9-5, § 23.4.) This is sufficient to bring the user's attention to the delegation provision and prevent surprise, particularly given that Airbnb is "under no obligation to highlight the arbitration clause of [a] contract, nor required to specifically call that clause to [the other party's] attention," nor call attention to the particular terms within the arbitration clause. *Sanchez*, 353 P.3d at 751.

The court also disagrees that the one-sentence delegation clause is so confusing as to be "unduly oppressive" to the user. *Plazza*, 289 F. Supp. 3d at 558. Perhaps the use of the word "dispute," both as a capitalized, defined term and as a generic term adds some of confusion to the delegation clause's meaning, but the sentence as a whole "plainly designates the arbitrator to decide any disputes over the arbitration agreement's enforceability or application." *Dunbar v. Airbnb, Inc.*, 2020 WL 1550236, at *5 (D. Haw. Apr. 1, 2020). Therefore, the court finds that "the factual circumstances present do not

rise to the level of being an unfair surprise or unduly oppressive, such that they warrant invalidation of the arbitration provision" based on procedural unconscionability. *Plazza*, 289 F. Supp. 3d at 558; *see also Concepcion*, 563 U.S. at 346–47 ("the times in which consumer contracts were anything other than adhesive are long past").

**B. Substantive Unconscionability**

Even if the agreement is minimally, procedurally unconscionable, it could still be invalid based on a high degree of substantive unconscionability. *Patrick*, 93 F.4th at 479. "[A]n agreement is substantively unconscionable where its enforcement would work 'a substantial degree of unfairness beyond a simple old-fashioned bad bargain.'" *Starace v. Lexington L. Firm*, 2019 WL 2642555, at *7 (E.D. Cal. June 27, 2019) (citing *Sanchez*, 61 Cal. 4th at 911). "Mutuality is the 'paramount' consideration when assessing substantive unconscionability." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 997 (9th Cir. 2012) (quoting *Abramson v. Juniper Networks, Inc.*, 115 Cal. App. 4th 638, 657 (2004)).

Plaintiffs first argue that the arbitration clause, and delegation clause within, is substantively unconscionable because it only requires the user to arbitrate her claims, rather than to both the user and Airbnb. However, the contract language directly contradicts this argument by requiring arbitration by both Airbnb and the user: "You and Airbnb *mutually agree* that any dispute . . . will be settled by binding individual arbitration . . . . If there is dispute about whether this Arbitration Agreement can be enforced or applies to our Dispute, you *and Airbnb* agree that the arbitrator will decide that issue." (Dkt. #9 5, at § 23.4) (emphasis added). Also contrary to plaintiffs' assertions, the court finds this clause's language sufficiently plain so as not to be substantively

unconscionable. While "you" is not precisely defined in the contract, at a minimum, it encompasses the user who signed the agreement—here, Charis Kuehl. *See also Dunbar v. Airbnb, Inc.*, 2020 WL 1550236, at *6 ("The delegation clause is not unreasonably favorable to Defendant, the more powerful party. The delegation clause clearly and unmistakably binds both parties to arbitrate.").

Plaintiffs next argue that the arbitration clause is substantively unconscionable given its broad scope and its requirement to arbitrate disputes under the contract beyond its termination. However, California courts routinely find that these aspects of arbitration clauses do not make them substantively unconscionable, but remain valid and enforceable. *Starace*, 2019 WL 2642555, at *8 (collecting cases finding arbitration clauses that cover "all disputes" between the contracting parties not substantively unconscionable); *Ajida Techs., Inc. v. Roos Instruments, Inc.*, 87 Cal. App. 4th 534, 545, 104 Cal. Rptr. 2d 686, 694 (2001) ("A party's contractual duty to arbitrate disputes may survive termination of the agreement giving rise to that duty."). Under California law, therefore, delegating to the arbitrator the question of whether the specific claims at issue fall under the arbitration agreement is neither procedurally nor substantively unconscionable. Accordingly, the court declines to analyze whether all of the Kuehl plaintiffs' claims fall within the scope of the arbitration agreement and leaves that question for the arbitrator.

## IV. Whether the California Arbitration Act or Federal Arbitration Act governs this court's decision on compelling arbitration

Finally, all plaintiffs argue that because the Terms of Service Agreement specifies that California substantive law applies to the contract's interpretation, the California

Arbitration Act and its accompanying procedural rules likewise bind this court. Specifically, plaintiffs argue that this court should follow Cal. Civ. Proc. Code § 1281.2(c), which allows courts applying that law to refuse to enforce an arbitration agreement where: (1) a party to that agreement is also a party to a pending court action arising out of the same transaction; and (2) there exists a possibility of conflicting rulings on a common issue of law or fact. Essentially, "section 1281.2(c) addresses the peculiar situation that arises when a controversy also affects claims by or against other parties not bound by the arbitration agreement," just like this case, where the Kuehl plaintiffs are bound to arbitrate their dispute against Airbnb, and the Witte plaintiffs are not, even though their claims likely rest on the same set of underlying facts and law. *Mount Diablo Med. Ctr. v. Health Net of California, Inc.*, 124 Cal. Rptr. 2d 607, 617 (Ct. App. 2002).

As the U.S. Supreme Court has explained, the FAA permits parties to specify the rules that govern the enforcement of their agreements to arbitrate. *See Ware v. Golden 1 Credit Union, Inc*., 375 F. Supp. 3d 1145, 1149 (E.D. Cal. 2019) ("Although the FAA typically preempts state laws that require a judicial forum to resolve disputes that parties have agreed to arbitrate [like section 1281.2(c)], 'it does not follow that the FAA prevents the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself.'") (quoting *Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior Univ*., 489 U.S. 468, 478-79 (1989)). The language of the arbitration agreement at issue determines whether the CAA or FAA's procedural rules apply to its enforcement. *Ware*, 375 F. Supp. 3d at 1150 ("[P]ost-*Volt* courts have both incorporated and declined

to incorporate the CAA's procedural rules, depending on the language of the choice-of-law clause.")

For agreements that specify that California substantive law applies, while designating that the AAA's procedural rules apply to enforcement of arbitration and arbitration itself, the FAA governs: "'[T]he best way to harmonize' the [California] choice-of-law clause with the AAA [rule] requirement [i]s to apply California's substantive law, but reject the state's 'special rules limiting the authority of arbitrators.'" *Id.* (quoting *Preston v. Ferrer*, 552 U.S. 346, 362 (2008); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63–64 (1995)).

While Airbnb's Terms of Service Agreement designates that California law controls its interpretation, (Dkt. #9-5, § 22), the agreement also specifies that the FAA applies to the arbitration provision: "Arbitration Rules and Governing Law: This Arbitration Agreement evidences a transaction in interstate commerce and the Federal Arbitration Act governs all substantive and procedural interpretation and enforcement of this provision. The arbitration will be administered by the arbitrator in accordance with . . . the 'AAA Rules' then in effect." (Dkt. 9-5, § 23.6.).[23] In contracts using similar language, California courts routinely hold that the FAA governs the enforcement of the arbitration clause, not the CAA, even where California substantive law controls interpretation of the whole agreement. *E.g., Ware*, 375 F. Supp. 3d at 1149; *Golden v. O'Melveny & Meyers LLP*, 2016

[23] As plaintiffs raise, Versions 13 and 14 of the Terms have slightly different 'Arbitration Rules and Governing Law' provisions. *See discussion, supra,* n.6. However, these differences do not appear to materially change the terms of the arbitration clause. Either way, since Charis Kuehl signed Version 13 when opening her Airbnb account, the court relies on that version's language for purposes of enforcement.

WL 4168853, at *16 (C.D. Cal. Aug. 3, 2016); *Diamond Foods, Inc. v. Hottrix*, LLC, No. 14-CV-03162-BLF, 2018 WL 3008562, at *7 (N.D. Cal. June 15, 2018); *BioMagic, Inc. v. Dutch Bros. Enters., LLC*, 729 F. Supp. 2d 1140, 1142 (C.D. Cal. 2010).

Since the plain language of the agreement is not ambiguous, that agreement incorporates the FAA for purposes of enforcement of the arbitration provision, and AAA rules apply to the arbitration itself, while California law applies as to the substantive interpretation of the agreement. (Dkt. 9-5, §§ 22, 23.6.) These designations are permissible under law. Therefore, this court must enforce the agreement to arbitrate according to the FAA and compel the Kuehl plaintiffs to arbitrate their claims against Airbnb.

**V. Effect of compelling arbitration under the FAA**

Under the FAA, the court must stay any substantive rulings in this case as to the arbitrable claims and parties. 9 U.S.C.A. § 3; *Smith v. Spizzirri*, 601 U.S. 472, 474 (2024). Therefore, the court shall stay this case with respect to the Kuehl plaintiffs' claims against Airbnb. As a matter of discretion, the court may also stay the case as to the Witte plaintiffs' claims against Airbnb, as well as all plaintiffs' remaining claims against the cabin owners and the defendants' respective insurers. *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 ("In some cases, it may be advisable to stay litigation among the nonarbitrating parties pending the outcome of the arbitration. That decision is one left to the district court . . . as a matter of its discretion to control its docket.").

In particular, a "district court has discretion to stay third party litigation involving common questions of fact within the scope of an arbitration agreement to which the third

party is not a signatory." *Asahi Glass Co. v. Toledo Eng'g Co.*, 262 F. Supp. 2d 839, 844–45 (N.D. Ohio 2003) (citations omitted); *see also Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991) ("It is appropriate, as an exercise of the district court's inherent powers, to grant a stay where the pending proceeding is an arbitration in which issues involved in the case may be determined.") (citations omitted). Indeed, where claims against parties bound to arbitration are intertwined with claims against nonsignatory third parties, a "discretionary stay may well be needed to further the strong federal policy favoring agreements to arbitrate." *Aliff v. Vervent, Inc.*, 2020 WL 5709197, at *11 (S.D. Cal. Sept. 24, 2020), *aff'd*, No. 20-56121, 2021 WL 5985584 (9th Cir. Dec. 17, 2021) (citing *AgGrow Oils, L.L.C. v. National Union Fire Ins. Co.*, 242 F.3d 777, 782 (8th Cir. 2001)).

Airbnb requests a discretionary stay, arguing that the same issues of fact and law underpin both the Witte and Kuehl plaintiffs' claims.[24] *See* Compl. (dkt. #2-1) (asserting all three claims against Airbnb identically as to all defendants). Given the overlapping factual and legal issues underpinning all plaintiffs' claims against all defendants, the possibility of conflicting rulings resulting from piecemeal litigation is real, and the interests of judicial economy argue for caution and efficiency moving forward. Thus, the court will grant Airbnb's request for a discretionary stay with respect to substantive, legal rulings in this lawsuit pending completion of that arbitration. However, the court is strongly disinclined to inhibit all reasonable discovery requests posed in this case or in arbitration for reasons already explained, including the need to preserve evidence at this point. Thus,

[24] Plaintiffs also did not respond to Airbnb's argument for a discretionary stay of the entire case pending the results of arbitration. (Dkt. #42, at 30.)

the court will enter no stay order with respect to discovery and will schedule a hearing on plaintiff Stephen Kuehl's Renewed Motion to Compel (dkt. #95) via videoconference on September 10, 2026, at 1:00 p.m.

ORDER

IT IS ORDERED that:

1) Defendant AIRBNB's motion to compel arbitration (dkt. #8) is GRANTED as to plaintiffs Stephen Kuehl, individually and on behalf of N.K., V.K., and the estates of S.K. and Charis Kuehl.

2) Defendant AIRBNB's motion to compel arbitration is DENIED as to plaintiffs Mary Witte, individually and on behalf of the estates of Steven Witte and Lydia Witte.

3) All substantive decisions in this case are STAYED pending completion of arbitration between Airbnb and the Kuehl plaintiffs.

4) The arbitrating parties are ORDERED to file an update with the court in 120 days reporting on the progress of that arbitration.

5) Discovery among the parties under the Rules of Civil Procedure to preserve the record SHALL CONTINUE.

6) A zoom videoconference on plaintiff Stephen Kuehl's pending renewed motion to compel discovery (dkt. #95) shall be held on September 10, 2026, at 1:00 p.m.

Entered this 4th day of September, 2026.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge